**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| GREGORY VRANCHES, *et al.* | ) CASE NO. 4:23-CV-02321-JDA |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) MAGISTRATE JUDGE |
| | ) JENNIFER DOWDELL ARMSTRONG |
| PHH MORTGAGE CORPORATION, | ) |
| | ) **OPINION AND ORDER** |
| Defendant. | ) |
| | ) |

## I.      INTRODUCTION

Plaintiffs Gregory Vranches and Mary Deborah Vranches ("Plaintiffs") have asserted claims against Defendant PHH Mortgage Corporation ("PHH") for breach of contract and violation of Ohio's Residential Mortgage Lending Act ("RMLA"), O.R.C. § 1322.01, *et seq*. The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF No. 5).

This matter is before the Court on PHH's motion for summary judgment. (ECF No. 39). For the reasons set forth below, PHH's motion is GRANTED IN PART and DENIED IN PART.

## II.     FACTUAL BACKGROUND[1]

On September 3, 2009, Plaintiffs took out a reverse mortgage on their home, with Financial Freedom Acquisition LLC, a subsidiary of OneWest Bank, FSB, serving as the

---

[1] Because this case is before the Court on PHH"s motion for summary judgment, the facts are presented here in the light most favorable to Plaintiffs.

lender. (ECF No. 39-11). The transaction consisted of three primary documents: (1) a fixed-rate note; (2) a closed-end fixed rate home equity conversion mortgage; and (3) a loan agreement. (ECF Nos. 39-10, 39-11, 39-12).

Plaintiffs' reverse mortgage is insured by the Department of Housing and Urban Development ("HUD") and governed by HUD regulations. Those regulations include requirements that taxes on the property be paid on or before the due date. *See* 24 C.F.R. § 206.205. The loan documents contain similar requirements. For example, the mortgage provides that Plaintiffs must "pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender . . . ." (ECF No. 39-11, § 2). Section 5 of the mortgage further provides that, if Plaintiffs fail to make those payments, the lender "may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes . . . ." *Id*. at § 5. Section 2.10.5 of the loan agreement similarly provides that, if Plaintiffs fail to pay property charges "in a timely manner . . . Lender shall pay the property charges as a Loan Advance . . . ." (ECF No. 39-12, § 2.10.5). Section 2.15.1 further provides that, if Plaintiffs are in default under the mortgage, "Lender may make reasonable expenditures to protect and preserve the Property . . . ." *Id*. at § 2.15.2.

Plaintiffs have experienced financial difficulties for years. On October 31, 2015, Financial Freedom sent Plaintiffs a notice that HUD had declared the mortgage due and payable because Plaintiffs failed to pay more than $11,000 in property charges. (ECF No. 39-14). Financial Freedom subsequently filed a foreclosure action against Plaintiffs in November 2016. PHH asserts that Financial Freedom voluntarily dismissed the case, but that the loan has remained delinquent ever since. Plaintiffs do not dispute that assertion.

On July 18, 2019, Plaintiffs' then-mortgage servicer, Celink, sent Plaintiffs a notice of delinquency because Plaintiffs failed to pay their property taxes, forcing Celink to advance over $18,000 on their behalf. (ECF No. 39-15). On September 24, 2019, Celink sent Plaintiffs a notice that their mortgage was due and payable as a result of their failure to pay property taxes. (ECF No. 39-16). Celink subsequently filed a foreclosure action against Plaintiffs. PHH has acknowledged that the referral to foreclosure "should not have happened" because Celink should have first determined whether Plaintiffs were entitled to a marketing extension. (ECF No. 36-1, PageID # 1313). PHH has also acknowledged that Plaintiffs were entitled to several extensions that delayed foreclosure, including: (1) a 90-day extension from February 28, 2020 through May 28, 2020 while Plaintiffs attempted to market the property for sale; and (2) three extensions from April 23, 2021 through July 23, 2021 as a result of HUD's mortgage foreclosure moratorium arising out of the COVID-19 pandemic. (ECF No. 36-1, PageID # 1312).

On July 1, 2021, Celink notified Plaintiffs that the servicing of their mortgage was transferring from Celink to Reverse Mortgage Solutions, Inc. ("RMS"). (ECF No. 39-30). On September 27, 2021, RMS filed a third foreclosure action (the "Third Foreclosure") in the Mahoning County Court of Common Pleas, alleging that Plaintiffs had defaulted on the promissory note and mortgage by failing to maintain taxes on the property. (ECF No. 39-8).[2]

On October 15, 2021, PHH notified Plaintiffs that it had become the servicer of Plaintiffs' mortgage. (ECF No. 39-13). The parties dispute precisely how PHH became the servicer. Plaintiffs assert that PHH acquired RMS and its employees and effectively stepped into the shoes of RMS. PHH says that it merely acquired the rights to service the loans. In a

---

[2] The foreclosure action was filed by Bank of New York Mellon Trust Company, N.A., as trustee for Mortgage Assets Management Series I Trust. The parties agree that the foreclosure action was filed at RMS' direction.

letter to Plaintiffs dated January 5, 2022, PHH stated that "as a result of a recent Agreement amongst [PHH], RMS, and RMS' parent company, Mortgage Assets Management, LLC (MAM), which became effective on October 1, 2021, PHH is now servicing the account on behalf of RMS and MAM." (ECF No. 36-1, PageID # 1311). PHH's corporate representative testified that PHH purchased RMS' servicing rights and that the employees remained the same. (ECF No. 36-1, 31:10-18).

On October 29, 2021, the trustee, at PHH's direction, filed a motion to dismiss the foreclosure action (ECF No. 39-1), which the court granted on November 8, 2021 (ECF No. 39-2). On January 5, 2022, PHH informed Plaintiffs that, while the account was delinquent and Plaintiffs were not entitled to another COVID-19 extension, PHH would grant Plaintiffs another six-month extension in light of prior statements from Celink that a six-month extension would begin as soon as HUD's foreclosure moratorium expired. (ECF No. 36-1, PageID # 1311-1313).

On or about October 7, 2022, Plaintiffs and PHH entered into a home equity conversion mortgage loss mitigation repayment plan (the "First Repayment Plan"). (ECF Nos. 39-17; 39-29). The plan required Plaintiffs to make 48 monthly payments of $529.58, beginning on October 30, 2022 and ending on September 30, 2026. *Id*. The plan further provided that Plaintiffs must "pay all future Property Charges before they become delinquent." *Id*. The plan stated that "[f]ailure to do so may cause your Repayment Plan to be deemed unsuccessful in accordance with HUD guidelines and we will be required by HUD to proceed with foreclosure." *Id*. On December 20, 2022, PHH canceled the plan because Plaintiffs failed to make the required $25,000 initial payment. (ECF No. 36-1, PageID # 1445). Plaintiffs do not assert any claims in this proceeding based on the First Repayment

Plan.

On or about January 24, 2023, Plaintiffs and PHH entered into another repayment plan (the "Second Repayment Plan"). (ECF No. 39-18). The Second Repayment Plan contained many of the same terms and conditions as the Second Repayment Plan, but provided that Plaintiffs would make 48 monthly payments of $507.51, beginning on January 29, 2023 and ending on December 29, 2026. *Id*.

In early 2023, the Mahoning County Treasurer issued a bill for property taxes on Plaintiffs' home for the first half of 2022 in the amount of $3,679.40. (ECF No. 39-4). The Mahoning County Treasurer sent the bill to Plaintiffs at their home address and informed them that the property taxes must be paid on or before March 10, 2023. *Id*. Mr. Vranches testified during his deposition that Plaintiffs were aware of the deadline to pay the taxes. (ECF No. 35-1, 119:8-14). PHH's internal logs reflect that, on March 3, 2023, Mr. Vranches called PHH and stated that he intended to pay the taxes. (Tr. 36-1, PageID # 1424). PHH advised Mr. Vranches to send proof of payment once he made it. *Id*. On the same day, a member of PHH's home retention department emailed PHH's tax division, stating that Mr. Vranches advised he would be paying the property taxes. (ECF No. 36-1, PageID # 1423). The PHH member also asked the tax department to confirm the due date for the taxes and was advised that the taxes were due on March 10th. *Id*.

On March 6, 2023, Corelogic Tax Services sent PHH a memorandum showing that Plaintiffs owed property taxes in the amount of $3,679.40 on or before March 10, 2023. (ECF No. 39-25).[3] On the same day, PHH's internal notes reflect that customer service representatives were instructed to call Mr. Vranches to confirm whether payment would be

---

[3] The memorandum is dated February 7, 2023. PHH's corporate representative testified that PHH did not receive the memorandum until March 6th. (ECF No. 36-1, 72:17-22).

made, and to tell him that PHH would make the payment if Mr. Vranches did not. (ECF No. 36-1, PageID # 1422). PHH's records do not reflect that PHH called Mr. Vranches on that day. (ECF No. 36-1, 80:8-20). Mr. Vranches called PHH the next day, but PHH's corporate representative, Kimberly Richard, testified that PHH did not advise Mr. Vranches at that time that PHH was remitting a check for the property taxes. *Id*. at 80:21-81:4.

On March 7, 2023, PHH paid the property taxes and canceled the Second Repayment Plan. (ECF No. 36-1, 78: 12-19; PageID # 1422). On March 9, 2023, PHH sent Plaintiffs a notice that it had canceled the Second Repayment Plan because Plaintiffs failed to timely pay property taxes for the first half of 2022. (ECF No. 39-19). PHH concedes that it paid the taxes before the final due date.

On March 15, 2023, PHH sent Plaintiffs a third repayment plan (the "Third Repayment Plan"). (ECF No. 39-31). The Third Repayment Plan contained essentially the same terms and conditions as the prior plans, but it required Plaintiffs to make 48 monthly payments of $563.04, beginning on April 14, 2023 and ending on March 14, 2027. *Id*. Plaintiffs signed the Third Repayment Plan on March 20, 2023. (ECF No. 39-20).

On July 23, 2023, a member of PHH's home retention department was instructed to call Plaintiffs to ask if Plaintiffs intended to pay the property taxes for the second half of 2022. (ECF No. 36-1, PageID # 1390). PHH called Plaintiffs the next day but did not speak to Plaintiffs. *Id*. On July 26, 2023, PHH received a memorandum from Corelogic stating that Plaintiffs owed $3,679.40 in property taxes, which were due by August 4, 2023. (ECF No. 39-27).[4] PHH paid the taxes the next day, more than a week before the deadline. (ECF No. 39-28). On the same day, PHH canceled the Third Repayment Plan, again asserting that

---

[4] The memorandum is dated July 11, 2023. PHH's corporate representative testified that PHH did not receive it until July 26th. (ECF No. 36-1, 108:18-24).

Plaintiffs "did not timely pay" the property taxes. (ECF No. 39-22).

On August 3, 2023, unaware that PHH had already paid the taxes, Plaintiffs obtained a cashiers' check from their daughter in the amount of $3,679.00, which corresponds almost exactly to the amount due for the property taxes. (ECF No. 35-1, PageID # 1056). Mr. Vranches testified that Plaintiffs intended to deposit the check and pay the property taxes in person on the due date. (ECF No. 35, 121:2-122:18).[5]

On or about August 4, 2023, the parties entered into a fourth repayment plan (the "Fourth Repayment Plan"). (ECF Nos. 39-23; 39-32). The Fourth Repayment Plan requires Plaintiffs to make 52 monthly payments in the amount of $558.03, beginning on September 1, 2023 and ending on December 1, 2027. *Id.* The parties agree that the Fourth Repayment Plan remains in effect.

## III.     LEGAL STANDARDS

### A.  <u>Summary Judgment Standard</u>

Summary judgment shall be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy. Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of

---

[5] Mr. Vranches initially testified that Plaintiffs obtained the certified check to pay the property taxes due on March 3, 2023. However, the check is dated August 3, 2023, and Plaintiffs assert that the check was intended to pay the taxes on August 4, 2023.

a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

## IV.    ANALYSIS

Plaintiffs assert both a common law breach of contract claim and a statutory claim under the RMLA. PHH argues that it is entitled to summary judgment because Plaintiffs have not created a triable issue on any element of their breach of contract claim. PHH also argues that Plaintiffs' RMLA claim fails because they have not shown that PHH engaged in any prohibited conduct and because Plaintiffs have not suffered recoverable damages.

### A.    <u>Plaintiffs' Breach of Contract Claim</u>

Plaintiffs allege that PHH breached the Second and Third Repayment Plans because PHH terminated those plans as a result of Plaintiffs' alleged failure to pay property taxes, even though PHH paid those taxes before they became delinquent and despite the fact that Plaintiffs intended to make timely payment.

Before analyzing the merits of the parties' arguments, the Court must determine what

law to apply. While both the mortgage and the loan agreement contain provisions stating that they are governed by Ohio law (ECF Nos. 39-11, § 17; 39-12, § 6.4), the Second and Third Repayment Plans do not contain a choice of law provision. "In breach of contract cases, where, as here, the contract lacks a choice-of-law provision, Ohio law provides that the Court should apply the law of the State with the most significant relationship to the parties and the contract," a test drawn from § 188 of the Restatement (Second) of Conflicts. *Mansour Gavin LPA v. Exclusive Group Holdings, Inc*., No. 1:23-cv-02105, 2024 WL 1520437, at *5 (N.D. Ohio Apr. 3, 2024) (citing *Ohayon v. Safeco Ins. Co. of Ill*., 91 Ohio St. 3d 474, 747 N.E.2d 206, 209 (2001)). "In ascertaining which State that is, the Court 'should consider the place of contracting, the place of negotiation, the place of performance, the location of the subject matter, and the domicile, residence, nationality, place of incorporation, and place of business of the parties.'" *Id*. (quoting *Ohayon*, 747 N.E.2d at 209).

The subject matter of the contract is Plaintiffs' home, which is located in Ohio. Plaintiffs are domiciled in Ohio, while PHH is a New Jersey corporation with its principal place of business in New Jersey. The parties have not provided any information regarding the place of contracting or negotiation, but both assume that Ohio law applies and cite exclusively to Ohio law throughout their briefs. On the information before it, the Court agrees that Ohio has the most significant relationship to the dispute. Accordingly, the Court will apply Ohio law to Plaintiffs' claim.

To prevail on a breach of contract claim under Ohio law, a plaintiff must prove four elements: (1) the existence of a contract; (2) the plaintiff's performance; (3) the defendant's breach; and (4) damages. *See In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (citing *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 104 N.E.3d 1076, 1083

(Ohio Ct. App. 2018)). PHH argues that Plaintiffs' claim fails on all four elements, so the Court will address each in turn.

### 1.      The Existence of a Contract

PHH first asserts that the Second and Third Repayment Plans did not impose any duties on it. PHH notes that it did not sign either plan, and states that "[t]he sole purpose of the Second and Third Repayment Plans was for *Plaintiffs* to take action, not PHH." (ECF No. 39, PageID # 2199). PHH also argues that Plaintiffs are "unable to point to a single clause in either Plan that requires PHH to do anything, and thus PHH cannot be found to have breached a non-existent duty." *Id*.

To the extent PHH is arguing that the repayment plans are not enforceable contracts or that PHH had no duties whatsoever under the plans, the Court disagrees. "When 'construing an agreement, the court should prefer a meaning which gives it vitality rather than a meaning which renders its performance illegal or impossible.'" *Talbert v. Cont'l Cas. Co*., 157 Ohio App. 3d 469, 811 N.E.2d 1169, 1172 (2004) (quoting *Kebe v. Nutro Machinery Corp*., 30 Ohio App. 3d 175 (1985)). "Generally, courts disfavor contract interpretations which render contracts illusory or unenforceable." *Id*. (citation and quotations omitted).

Here, the clear import of the Second and Third Repayment Plans is that, if Plaintiffs fulfilled their obligations under the plans, PHH would keep the plans in place and would refrain from foreclosing on Plaintiffs' home. The plans inform Plaintiffs that they have "qualified for a HUD-compliant Home Equity Conversion Mortgage ("HECM") Loss Mitigation Repayment Plan," which will "allow the total amount due to be repaid in monthly installments over time." (ECF No. 39-18, PageID # 2266; ECF No. 39-31, PageID # 2309).

The plans then set forth a series of terms Plaintiffs are agreeing to. The plans warn Plaintiffs that failing to sign and return the agreements on time will "invalidate this

10

Repayment Plan and may require us to proceed to foreclosure . . . ." *Id.* at PageID # 2267, 2310. The plans also warn Plaintiffs that, "[s]hould you fail to make each payment in full and on time, your Repayment Plan will be deemed unsuccessful in accordance with HUD guidelines and we may proceed to foreclosure . . . ." *Id.* And, of particular relevance here, the plans state that Plaintiffs must pay all property charges in full before they become delinquent and that "[f]ailure to do so may cause your Repayment Plan to be deemed unsuccessful in accordance with HUD guidelines and we will be required by HUD to proceed with foreclosure." *Id.*

Each plan thus repeatedly warns Plaintiffs that, *if* they fail to fulfill their obligations, they will have committed a breach, meaning that PHH may deem the plans unsuccessful and foreclose on the property. The corollary is that, so long as Plaintiffs do *not* commit a breach, the repayment plan will remain in effect and PHH will not put the property into foreclosure. Plaintiffs are correct that a contrary reading would render the plans illusory in contravention of Ohio's rules of contract interpretation. Thus, the Court disagrees with PHH's assertion that the plans imposed no duty upon it whatsoever. Instead, the Court reads the repayment plans as requiring PHH to refrain from terminating them or foreclosing on the property so long as Plaintiffs fulfilled their obligations under the plans.

### 2.       *Plaintiffs' Performance*

PHH next argues that it is entitled to summary judgment because Plaintiffs failed to perform their obligations under the repayment plans. PHH asserts that Plaintiffs "agreed to pay all Property taxes before they became delinquent, but did not do so, resulting in a breach of both plans." (ECF No. 39, PageID # 2110).

Plaintiffs respond that their failure to perform is excused because PHH prevented them from performing by paying the property taxes before they were due. "The prevention of

performance doctrine provides that a party who prevents another from performing its contractual obligations cannot rely on that failure of performance to assert breach of contract." *Lucarell v. Nationwide Mut. Ins. Co*., 152 Ohio St. 3d 453, 97 N.E.3d 458, 466 (2018). "[T]he doctrine is based on the long-established principle of law that a party should not be able to take advantage of its own wrongful act." *Id*. (quoting Williston on Contracts, § 39:6 (4th Ed. 2003)).

PHH argues that the prevention of performance doctrine under Ohio law is available only as a defense to a breach of contract claim. However, courts have applied the doctrine more broadly, holding that it can excuse a plaintiff's non-performance. *See Orion Mgmt., Inc. v. Kaeka*, No. 30797, --- N.E.3d ---, 2025 WL 915607, at *18 (Ohio Ct. App. Mar. 26, 2025) (holding that a reasonable juror could conclude that the prevention of performance doctrine excused homeowners' non-performance in their counterclaim for breach of contract); *Antero Res. Corp. v. Tejas Tubular Prods, Inc*., 610 F. Supp. 3d 1047, 1060 (S.D. Ohio 2022) (holding that genuine dispute of material fact existed regarding whether counter-defendant prevented counter-plaintiff from performing on the settlement agreement); *Harwood v. Avaya Corp*., No. C2-05-828, 2007 WL 1574116, at *9 (S.D. Ohio May 25, 2007) (applying the prevention of performance doctrine to excuse plaintiffs' nonperformance where employer prevented plaintiffs from satisfying continued employment condition that would have entitled them to bonuses).

PHH also disputes whether its actions actually prevented Plaintiffs from paying the property taxes. PHH argues that "[a]s the evidence shows, Plaintiffs could not pay the Property taxes because of their financial issues." (ECF No. 39, PageID # 2110). In support of that argument, PHH cites to, among other things, testimony from Ms. Vranches regarding

Plaintiffs' ongoing financial struggles and difficulties paying the property taxes. *Id*.; *see* ECF No. 37-1, 21:23-22:20; 44:3-22; 48:5-16.

However, Mr. Vranches testified that Plaintiffs had the funds to pay the taxes in both March and August 2023. (ECF No. 35-1, 154: 11-155:5). Indeed, Mr. Vranches testified that Plaintiffs received a cashiers' check from their daughter to pay the taxes for the second half of 2022 in connection with the Third Repayment Plan. (ECF No. 35-1, 154:11-20). A copy of that check was used as an exhibit in Mr. Vranches' deposition, and the amount of the check corresponds to the amount due on the property taxes. (ECF No. 35-1, PageID # 1056).

PHH argues that Mr. Vranches' testimony lacks credibility because Plaintiffs admitted that they have experienced ongoing financial difficulties since at least 2014 and because Plaintiffs previously failed to pay the property taxes on multiple occasions. At summary judgment, however, I must view the facts in the light most favorable to Plaintiffs and must draw all reasonable inferences in their favor. *See Matsushita Elec.*, 475 U.S. at 587. Mr. Vranches' testimony, combined with the check, is sufficient to create a triable question regarding whether Plaintiffs would have paid the property taxes but for PHH's decision to pay them in advance of the deadline.

PHH also cites to a declaration from Ms. Richard, a senior loan analyst at PHH's parent corporation, attesting that PHH spoke to Mr. Vranches on March 10, 2023, and offered to reinstate the terms of the Second Repayment Plan if Plaintiffs paid the property taxes to the county treasurer on that day. (ECF No. 39-9, ¶ 14). PHH argues that Plaintiffs' failure to accept that offer shows that they did not have the ability to pay the property taxes on or before the due date. As Plaintiffs note, however, there is evidence in the record disputing Ms. Richard's statement. In particular, Plaintiffs point to an internal PHH note from March 10,

2023 summarizing a phone call a PHH representative had with Mr. Vranches, which states, "[e]xplained since the [repayment plan] is canceled and we cannot reinstate it he agreed to just set up a new payment plan." (ECF No. 36-1, PageID # 1422). There is thus a factual dispute regarding whether Mr. Vranches refused an offer to reinstate the Second Repayment Plan. PHH is not entitled to summary judgment on its argument that Plaintiffs failed to perform their obligations under the plans.

### 3.    PHH's Breach

PHH also argues that it is entitled to summary judgment because there is no dispute of material fact regarding whether it breached the Second or Third Repayment Plans. In particular, PHH argues that because Plaintiffs failed to timely pay the property taxes, it was entitled to pay the taxes on Plaintiffs' behalf and then terminate the repayment plans.

The Court agrees that PHH had the right under the loan documents to pay property taxes to preserve the value of the property. As PHH correctly notes, Section 2.15.1 of the loan agreement gives the lender (whose loan PHH is servicing) the right to "make reasonable expenditures to protect and preserve the Property" in the event of a default. (ECF No. 39-12, Exhibit C, § 2.15.1). Section 2.15.2 likewise provides that the lender can pay any governmental or municipal charges necessary to protect the value of the property if Plaintiffs fail to do so. *Id*. at § 2.15.2. Similarly, Section 5 of the mortgage states that, if Plaintiffs fail to pay property charges, the lender "may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes . . . ." (ECF No. 39-11, § 5).

Plaintiffs do not dispute that these provisions generally give PHH the right to pay property taxes if the loan is in default or if Plaintiffs fail to pay them. Instead, Plaintiffs argue that the repayment plans amended and superseded those portions of the loan documents. It is

14

true that Ohio law permits the parties to amend an existing contract. *See Smaldino v. Larsick*, 90 Ohio App. 3d 691, 630 N.E.2d 408, 412 (1993) ("Subsequent acts and agreements may modify the terms of a contract, and unless otherwise specified, neither consideration nor a writing is necessary."). However, "a subsequent contract does not supersede or modify unambiguous terms in a preceding contract unless the subsequent agreement specifically evidences an intent to do so." *Columbia Gas Transmission Corp. v. Ogle*, 51 F. Supp. 2d 866, 873 (S.D. Ohio 1997) (quoting *TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 70 Ohio St. 3d 271, 638 N.E.3d 572, 576 (1994)); *see also Schempp v. GC Acquisition, LLC*, 161 F. Supp. 3d 584, 591 (N.D. Ohio 2014) ("[w]here a subsequent contract unambiguously displays the parties' intention to supersede or modify terms in a previous contract, the terms of the subsequent contract will control") (citing *TRINOVA*, 638 N.E.2d at 576).

The Second and Third Repayment Plans do not show any specific intent to modify the terms of the mortgage or the loan agreement regarding PHH's ability to pay property taxes. To the contrary, the repayment plans specifically provide that PHH "does not waive any rights or claims it may have under the terms of your loan by offering or entering into this Repayment Plan." (ECF Nos. 39-18, PageID # 2267; 39-31, PageID # 2310). Plaintiffs' argument that the repayment plans eliminated PHH's right to pay property taxes to preserve the value of the property thus fails as a matter of law.

That does not mean, however, that PHH is entitled to summary judgment on Plaintiffs' breach of contract claim. PHH assumes that, so long as the loan documents permitted them to pay property taxes, any payment that PHH made cannot, by definition, have violated the repayment plans. However, the repayment plans are separate agreements between the parties, and the Court has already concluded that they imposed obligations on PHH. PHH's

interpretation would effectively read the plain language of the repayment plans out of existence.

To demonstrate the problem with PHH's contrary interpretation, consider a hypothetical situation. Suppose that a month before property taxes are due, Corelogic sends PHH a memorandum informing PHH of the tax due date and the amount of the tax owed. Concerned that Plaintiffs will not be able to pay given their financial difficulties and prior defaults, PHH immediately pays the property taxes without contacting Plaintiffs at all. While PHH would be within its rights under the mortgage and the loan documents to pay the taxes, it could not be fairly said that Plaintiffs failed to pay property charges "before they became delinquent." Yet PHH's interpretation would allow it to terminate the repayment plans on the grounds that PHH had not paid the property taxes before they were due, effectively rendering the terms of the repayment plans a nullity.

The plain language of the plans does not support such a result. Instead, the Court concludes that the better interpretation, and the one that gives effect to all the parties' agreements, is to treat PHH's right to pay property taxes under the loan documents as separate from its obligation to continue the repayment plans and refrain from pursuing foreclosure so long as Plaintiffs fulfilled their obligations under the plans. Under the mortgage and the loan documents, PHH may pay property taxes to preserve the value of the property. Under the repayment plans, however, PHH may terminate for breach only if Plaintiffs actually do fail to pay the property taxes "before they become delinquent."

The question, then, is whether Plaintiffs breached the repayment plans by failing to pay property taxes. The repayment plans state that Plaintiffs must pay property charges, including property taxes, "before they become delinquent." *Id*. The plans do not define the

term "delinquent." "Under Ohio law, 'common words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument.'" *Norfolk S. R.R. Co. v. Allied Erecting & Dismantling Co., Inc*., 775 F. App'x 178, 193 (6th Cir. 2019) (quoting *Alexander v. Buckeye Pipe Line Co*., 53 Ohio St. 2d 241, 374 N.E.2d 146, 150 (1978)).

Merriam-Webster defines "delinquent" as "being overdue in payment." *Delinquent*, Merriam Webster Online Dictionary, [https://www.merriam-webster.com/dictionary/delinquent](https://www.merriam-webster.com/dictionary/delinquent) (*last accessed*, August 22, 2025). Black's Law Dictionary likewise defines "delinquent" as "past due or unperformed." *Delinquent*, Black's Law Dictionary (12th ed. 2024). Under either definition, the property taxes would not become delinquent until the deadline for Plaintiffs to pay them had passed. Plaintiffs cite an Ohio case supporting that interpretation in the specific context of county property taxes. *See Wells Fargo Bank, N.A. v. Smith*, No. 2010-T-0051, 2012 WL 1288494, at *5 (Ohio Ct. App. Apr. 16, 2012) (holding that "county taxes on real property are viewed as 'delinquent' if [they are] not paid by the last day prescribed under the law.").

The repayment plans required Plaintiffs to pay the taxes "before" they become delinquent. PHH appears to argue that Plaintiffs breached that obligation because, at the time PHH paid them, Plaintiffs had not yet remitted payment and the due date imminent. However, the natural reading of the phrase "before they become delinquent" is that Plaintiffs had to pay the property taxes in a manner that prevented them from entering delinquent status—*i.e*., that Plaintiffs needed to pay the property taxes on or before the due date. If PHH wanted to require Plaintiffs to pay the property taxes sufficiently in advance of the due date to avoid any

concerns about nonpayment, it could have included that requirement in the plain language of the repayment plans. PHH did not do so, and the Court will not interpret the plans to incorporate a term that PHH failed to include.

Plaintiffs have thus created a triable issue regarding whether PHH breached its obligations under the repayment plans by terminating the plans for a default that Plaintiffs had not yet committed. To the extent PHH argues that it paid the taxes only because it was clear that Plaintiffs could not and would not pay them, Plaintiffs have created a triable issue on that argument as well, for the reasons discussed above.

### 4. *Damages*

Finally, PHH argues that Plaintiffs have not created a triable issue regarding whether they suffered recoverable damages. Under Ohio law, "a claimant seeking to recover for breach of contract must allege, and ultimately show, damages as a result of the breach." *Duff v. Centene Corp.*, 565 F. Supp. 3d 1004, 1020 (S.D. Ohio 2021) (citing *Logsdon v. Ohio N. Univ.*, 68 Ohio App. 3d 190, 587 N.E.2d 942, 946-47 (1990)). "[A] plaintiff need not quantify those economic damages to survive summary judgment, but it must offer evidence of the *existence* of economic damages to survive summary judgment." *CajunLand Pizza, LLC v. Marco's Franchising, LLC*, No. 3:20-cv-536, 2024 WL 1014028, at *2 (N.D. Ohio Mar. 8, 2024) (quoting *Princeton Radiology Assocs., P.A. v. Advoc. Radiology Billing & Reimbursement Specialists*, No. 2:19-CV-2311, 2022 WL 501205, at *5 (S.D. Ohio Jan. 3, 2022)) (emphasis in original).

"Damages for a breach of contract are those which are the natural or probable consequence of the breach of contract or damages resulting from the breach that were within the contemplation of both parties at the time of making the contract." *The Toledo Group, Inc. v. Benton Indus., Inc.*, 87 Ohio App. 3d 798, 623 N.E.2d 205, 211 (1993). "Ohio law limits a

non-breaching party's recovery to 'actual' or 'expectation' damages—that is, damages that put the injured party 'in as good a position as it would have been in but for the breach'—and requires the injured party to prove these damages with reasonable certainty." *Moriarty v. Equisearch Servs., Inc.*, 443 F. App'x 64, 66 (6th Cir. 201) (quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App. 3d 137, 684 N.E.2d 1261, 1266 (Ohio Ct. App. 1996)).

Plaintiffs argue that they have suffered four categories of damages as a result of PHH's breach: (1) loss of the use of funds they paid toward the Second and Third Repayment Plans; (2) an extension of the repayment period and the continuing default status of the loan when compared to the position Plaintiffs would be in had PHH not terminated the plans; (3) time and expenses incurred in attempting to comply with the repayment plans and other issues; and (4) damages for emotional distress.

PHH argues that Plaintiffs cannot seek damages for any amounts they paid toward the Second or Third Repayment Plans because PHH used those funds to pay down Plaintiffs' outstanding balance on the loan, an amount that Plaintiffs would need to pay back regardless. However, it is undisputed that Plaintiffs made several payments toward the repayment plans and that those plans were not completed because PHH terminated them. The net effect of replacing the Second Repayment Plan with the Fourth Repayment Plan is that Plaintiffs will be making payments until December 1, 2027, rather than December 29, 2026, the end of the repayment period if the Second Repayment Plan had remained in effect. *Compare* ECF No. 39-18, PageID # 2266 *with* ECF No. 39-23, PageID # 2293. At this stage, the Court concludes that the payments Plaintiffs made toward the plans and the extended time in default are potentially cognizable damages and that Plaintiffs have presented sufficient evidence of their

existence to survive summary judgment.

It is less clear whether Plaintiffs can recover damages for emotional distress. In *Kishmarton v. William Bailey Construction, Inc*., the Ohio Supreme Court held that a party may recover emotional distress damages for breach of contract in certain circumstances. 93 Ohio St. 3d 226, 754 N.E.2d 785, 787-88 (2001). Specifically, a plaintiff may recover emotional distress damages where "the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional distress was a particularly likely result." *Id*. at 788. In reaching that holding, the Ohio Supreme Court adopted Section 353 of the Restatement (Second) of Contracts, which identifies certain situations where a breach is particularly likely to result in emotional distress. As examples, the Second Restatement lists "contracts of carriers and innkeepers with passengers and guests, contracts for the carriage or proper disposition of dead bodies, and contracts for the delivery of messages concerning death." Restatement (Second) of Contracts, § 353, comment a (1981).

The *Kishmarton* rule is not broad. Rather, following *Kishmarton*, Ohio "recognizes a closely-circumscribed set of contractual breaches" for which emotional distress damages are recoverable. *Taylor v. Honda Motorcars, Inc*., 135 N.E.3d 1284, 1291-92 (Ohio Ct. App. 2019) (quoting *Clay v. Shriver Allison Courtley Co.*, No. 17 MA 0003, 2018 WL 6930480, at *4 (Ohio Ct. App. Dec. 20, 2018)). The question is whether Plaintiffs' damages fall within that narrow category.

The answer is not entirely clear. In *Kishmarton*, the Ohio Supreme Court held that the plaintiff could recover emotional distress damages in a suit by a vendee against a building vendor. 754 N.E. 2d 788. In *Stockdale v. Baba*, the court likewise held that emotional distress damages were available where a defendant accused of stalking breached a settlement

agreement that prohibited the defendant from ever contacting the plaintiffs again. 153 Ohio App. 3d 712, 795 N.E.2d 727, 744 (2003) (holding that contract was "intensely personal in nature" and that purpose of contract was to prevent further emotional harm to victims).

By contrast, in *Taylor*, the court held that a car lease agreement was not the type of agreement that was particularly likely to result in severe emotional distress. 135 N.E. 3d at 1292-93. Similarly, in *Carpenter v. Liberty Insurance Corp.*, 413 F. Supp. 3d 727 (S.D. Ohio 2019), the court held that an insurance contract was not the type of contract where breach was particularly likely to result in severe emotional distress, even though the plaintiffs in that particular case argued that they had two special needs children and that a financial setback could render them homeless. *Id*. at 733.

This case is far closer to the car lease in *Taylor* or the insurance contract in *Carpenter* than it is to the intensely personal anti-stalking settlement agreement in *Stockdale*. As a result, the Court is skeptical that Plaintiffs can recover emotional distress damages on their breach of contract claim, particularly given *Kishmarton*'s statement that permitting emotional distress damages in breach of contract actions involving vendees and building vendors would not "open the floodgates." 754 N.E. 2d at 788. However, the Court acknowledges that, in *Sinclair v. Donovan*, Nos. 1:11-CV-00010, 1:11-CV-00079, 2011 WL 5326093 (S.D. Ohio Nov. 4, 2011), a court in our sister district held at the motion to dismiss stage that mortgage agreements involving low-income borrowers *were* particularly likely to result in severe emotional distress. In reaching that holding, the court relied on a comment to Section 353 of the Second Restatement, which provides that:

> Breach of other types of contracts, resulting for example in sudden impoverishment or bankruptcy, may by chance cause even more severe emotional disturbance, but, if the contract is not one where this was a particularly likely risk, there is no recovery for such

disturbance.

Restatement (Second) of Contracts, § 353, cmt. a. (1981). Applying that language, the *Sinclair* court held that mortgages to low- and moderate-income borrowers insured by HUD are particularly likely to result in sudden impoverishment or bankruptcy because "[t]he statutory framework that governs their financial relationship presumes the possibility, indeed probability, of borrower default and subsequent foreclosure." *Id*. at *9.

Neither party cites *Sinclair* in their briefs. Nor do the parties cite to any other cases analyzing the availability of emotional distress damages in the foreclosure setting. Given the potential complexity of the issue and the fact that Plaintiffs have provided sufficient evidence of other categories of damages to survive summary judgment, the Court concludes that further briefing is required before making a final determination on this question. If PHH wishes to preclude Plaintiffs from seeking to present evidence of emotional distress damages on their breach of contract claim, it may file an appropriate motion *in limine* prior to trial. At this stage, Plaintiffs have created a triable question on all elements of their breach of contract claim, and PHH's motion for summary judgment is denied as to that claim.

## B.    Plaintiffs' Claims Under the RMLA

Plaintiffs also assert claims under two provisions of the RMLA, O.R.C. § 1322.40 and O.R.C. § 1322.45. Section 1322.40 provides in relevant part that no registrant shall "[e]ngage in conduct that constitutes improper, fraudulent, or dishonest dealings." O.R.C. § 1322.40(C). Section 1322.45 provides in relevant part that a registrant must "[a]ct with reasonable skill, care, and diligence" and must "[a]ct in good faith and with fair dealing" in connection with any transaction. O.R.C. § 1322.45(A)(3)-(4).

"[T]he RMLA provides distinct causes of actions to parties injured by violations of § 1322.40, on the one hand, and § 1322.45, on the other." *Steele v. Comm. Loan Serv., LLC*,

No. 1:23-cv-497, 2024 WL 37116, at *3 (S.D. Ohio Jan. 3, 2024). "[W]hile the RMLA prevents a party from recovering under both § 1322.40 and § 1322.45 for the same conduct, the provisions detailing that the remedies are mutually exclusive both expressly state that each is vindicated via a distinct cause of action." *Id*.

Mortgage servicers like PHH are "registrants" under the RMLA, and PHH concedes that Sections 1322.40 and 1322.45 apply to it. *See* O.R.C. § 1322.07(A)(1) (providing that a "mortgage servicer" must obtain a certificate of registration); *Becker v. PennyMac Loan Servs., LLC*, 583 F. Supp. 3d 1090, 1105 (S.D. Ohio 2022) (noting that, in amending the Ohio Mortgage Broker Act to create the RMLA, "the General Assembly saw fit to include mortgage servicers as an entity requiring registration").

Plaintiffs argue that PHH violated both Sections in three distinct ways. First, Plaintiffs argue that PHH is liable for the third foreclosure action because PHH acquired RMS, the party that wrongfully filed the action, and because PHH failed to timely move to dismiss the action once it became clear that RMS should not have filed it. Plaintiffs also argue that PHH erroneously informed the court that the foreclosure action was being dismissed on loss mitigation grounds, rather than because RMS should not have filed the action in the first place. Second, Plaintiffs argue that PHH wrongfully terminated the Second and Third Repayment Plans as a result of Plaintiffs' alleged non-payment of property taxes even though PHH paid those taxes before they became due. Third, Plaintiffs argue that PHH violated the RMLA by threatening foreclosure after terminating the plans. Because Plaintiffs assert claims under both Section 1322.40 and Section 1322.45, the Court will analyze each section in turn.

### 1. *Section 1322.40*

As noted above, Section 1322.40 prohibits a mortgage servicer from engaging in conduct that is fraudulent, dishonest, or improper. O.R.C. § 1322.40(C). The RMLA does not

define the term "improper" for purposes of the statute, and a court in our sister district has noted that "'improper' is a difficult word to construe," as it "does not have a common-law analogue . . . ." *Steele*, 2024 WL 37116, at *5. In addition, "Ohio courts have yet to flesh out the full contours of what the category 'improper conduct' under this statute includes." *Id*.

Relying on *Steele*, PHH argues that the Court should apply the canon of *noscitur a sociis*, pursuant to which "a word is known by the company it keeps." *Id*. at *5 (quoting *Dubin v. United States*, 599 U.S. 110, 124 (2023)). In this case, PHH says the canon means the Court should interpret "improper" under Section 1322.40 as requiring some form of deception.

It is true that the *Steele* court *discussed* the canon of *noscitur a sociis* when analyzing Section 1322.40. To the extent PHH suggests that the *Steele* court *endorsed* the use of the canon in this instance, however, PHH is incorrect. To the contrary, the *Steele* court expressly stated that "limiting the definition of 'improper' in that fashion is difficult to square with regulations Ohio promulgated in 2016 setting forth a non-exhaustive list of behaviors it considers § 1322.40 violations." *Id*. As the court noted, while some of those examples "cover behavior that is arguably deceptive . . . others on the list do not appear to have a nexus to deception." *Id*. (citing Ohio Admin. Code § 1301:8-7-16(A) (failing to return original documents); *id*. at § 1301:8-7-16(I) (mishandling loan application materials)). The court concluded that the inclusion of non-deception-based examples "suggests that deception is not the touchstone of improper conduct." *Id*.

The *Steele* court ultimately concluded that the lack of clear statutory guidance left it "in a bit of quandary," and decided that it did not need to provide a definitive interpretation at the motion to dismiss stage. *Id*. at *6-7. At least one court in this district has similarly discussed the issue in connection with a motion for judgment on the pleadings while

concluding that it was premature to provide a definitive answer. *See Guzman v. USAA Fed. Sav. Bank*, No. 3:23 CV 1193, 2024 WL 1973096, at *17 (N.D. Ohio May 3, 2024) ("this Court agrees with the *Steele* court and acknowledges that the standards set forth in Ohio Rev. Code §§ 1322.40(C) and 1322.45(A) involving whether conduct was 'improper' or 'unreasonable' are not well-suited for judgment on the pleadings").

The interpretation of "improper" under Section 1322.40 of the RMLA thus appears to be an issue of first impression. When interpretating a state statute, a federal court sitting in diversity must predict how the highest court of that state would decide the issue. *See Beverage Distribs., Inc. v. Miller Brewing Co*., 690 F.3d 788, 792 (6th Cir. 2012) ("If the [Ohio] Supreme Court has not yet addressed the issue presented, [this Court] must predict how it would rule, by looking to 'all relevant data,' including state appellate decisions.") (quoting *Kessler v. Visteon Corp*., 448 F.3d 326, 329-30 (6th Cir. 2006)); *Bevan & Assocs., LPA, Inc. v. Yost*, 929 F.3d 366, 374 (6th Cir. 2019) ("it is not disputed that the Ohio Supreme Court has not yet passed on § 4123.88, and thus we must predict how that court would interpret the statute").

"When confronted with an argument over the meaning of a statute, [the Ohio Supreme Court's] paramount concern is the legislative intent of its enactment." *State ex rel. Prade v. Ninth Dist. Court of Appeals*, 151 Ohio St. 3d 252, 87 N.E.3d 1239, 1242 (2017) (per curiam) (quotations omitted). "In discerning legislative intent, [the court] consider[s] the statutory language in context, construing words and phrases in accordance with rules of grammar and common usage." *Id*. (quotations omitted). "[W]hen the meaning of a statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary." *Id*. (quotations omitted); *see also Symmes Twp. Bd. of Trs. v. Smyth*, 87 Ohio St. 3d 549, 721

N.E.2d 1057, 1061 (2000) ("When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need for [the court] to apply the rules of statutory interpretation"). "Where a statute is found to be subject to various interpretations, however, a court called upon to interpret its provisions may invoke rules of statutory construction in order to arrive at the legislative intent." *Symmes*, 721 N.E.2d at 1061. "The Ohio Supreme Court does not interpret statutory provisions 'in a vacuum, but rather . . . in the context of the statute as a whole.'" *Yost*, 929 F.3d at 374 (quoting *O'Toole v. Denihan*, 118 Ohio St. 3d 374, 889 N.E.2d 505, 515 (2008)).

When a federal court interprets a state statute, "[i]ntermediate state appellate court decisions are 'viewed as persuasive unless it is shown that the state's highest court would decide the issue differently.'" *Davis v. Sunset Cylinder Exch., LLC*, No. 3:22 CV 471, 2023 WL 130839, at *2 (N.D. Ohio Jan. 9, 2023) (quoting *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005)). No Ohio appellate court has interpreted the term "improper" as used in the RMLA. In *FV 1, Inc. v. Goodspeed*, 974 N.E.2d 664 (Ohio Ct. App. 2012), however, the court did analyze the term "improper" for purposes of the RMLA's predecessor statute, the Ohio Mortgage Broker Act ("OMBA"). As with the RMLA, the OMBA prohibited "improper" conduct, but did not define the term "improper." *Id*. at 676. Accordingly, the court applied the term's "common everyday meaning," which the court defined as "not in accord with truth, fact, or right procedure." *Id*. (quoting *Improper*, Merriam Webster Online Dictionary, http://www.merriam-webster.com/dictionary/improper (*last accessed*, Aug. 22, 2025)).

The Court acknowledges *Steele*'s statement that dictionary definitions "do[] not necessarily advance the statutory interpretation inquiry," because defining "improper" as

coextensive with "incorrect," "unsuitable," or "irregular" "all imply that one must compare the loan servicer's actions in a given case to some baseline conduct that is fitting for the given context." 2024 WL 37116, at *5 (emphasis omitted). Without other guidance, however, the Ohio appellate court's interpretation of the same term in the RMLA's predecessor statute provides the best indication of how the Ohio Supreme Court would likely decide the issue. I therefore hold that the term "improper" for purposes of Section 1322.40 means conduct that is "not in accord with truth, fact, or right procedure." *FV 1, Inc*., 974 N.E. 2d at 676.

The question, then, is whether Plaintiffs have created a dispute of material fact regarding whether PHH's actions were improper under that definition. With respect to Plaintiff's claim that PHH acted improperly in terminating the repayment plans as a result of Plaintiffs' alleged failure to pay property taxes, the Court answers that question in the affirmative. As discussed above in connection with Plaintiffs' breach of contract claim, they have presented sufficient evidence at this stage for a jury to find that PHH terminated the repayment plans for an alleged breach that Plaintiffs did not actually commit and would not have committed. The Court is also persuaded that terminating the repayment plans for a non-existent breach would not be "in accord with truth, fact, or right procedure." *See Ruckman v. PHH Mortg. Corp*., No. 5:21-cv-00923, 2022 WL 16575453, at *20 (N.D. Ohio Nov. 1, 2022) (holding that plaintiff stated claim under Section 1322.40 because "[a] jury . . . may conclude that Defendants sandbagged [plaintiff] . . . when they filed a summary judgment motion before the expiration of the deadline communicated to [her]").

I reach a different conclusion, however, with respect both to Plaintiffs' arguments that PHH violated Section 1322.40 by: (1) failing to dismiss the Third Foreclosure Action sooner or for the right reasons; and (2) threatening foreclosure after terminating the Second and Third

Repayment Plans. With respect to the former issue, PHH has offered undisputed evidence that the foreclosure action was filed at the behest of the loan's prior servicer, RMS, rather than PHH. PHH has also provided undisputed evidence that it assumed responsibility for servicing the loan on or about October 1, 2023 and that a motion to dismiss the foreclosure action was filed on October 29, 2021, less than a month later. (ECF No. 39-1).

Plaintiffs have not shown that a 19-day delay in seeking dismissal is "improper" conduct for purposes of Section 1322.40. Nor have Plaintiffs shown that the Court should hold PHH responsible for RMS' alleged wrongful conduct because PHH purportedly acquired RMS. The only evidence before the Court is the testimony of PHH's corporate representative that PHH purchased the "servicing rights" to the loans and that the employees remained the same. (ECF No. 36-1, 31:14-18). To the extent Plaintiffs are pursuing a successor liability theory, they have failed to substantiate the argument either factually or legally.

Plaintiffs also have not shown that PHH acted "improperly" by moving to dismiss the foreclosure action on loss mitigation grounds rather than because RMS should not have filed in the first place. Even assuming Plaintiffs are correct that loss mitigation was not the proper basis for dismissal, they have not shown how PHH's description of the dismissal harmed them at all.

Plaintiffs further argue that PHH acted improperly in connection with the Third Foreclosure because it is still seeking to recover $1,500 in attorneys' fees from Plaintiffs even though RMS should not have pursued the foreclosure. However, Ms. Richard, PHH's corporate representative, testified that PHH is not charging Plaintiffs for those fees. (ECF No. 36-1, 129:20-130:10). Accordingly, PHH is entitled to summary judgment on Plaintiffs' Section 1322.40 claim to the extent Plaintiffs base their claims on any improper conduct

relating to the Third Foreclosure.

PHH is also entitled to summary judgment on Plaintiffs' Section 1322.40 claim to the extent Plaintiffs premise the claim on PHH's alleged threats of foreclosure following termination of the repayment plans. As an initial matter, it is not clear that PHH actually threatened foreclosure, as Plaintiffs cite to an internal note that PHH had transitioned servicing to the foreclosure team. (ECF No. 36-1, PageID # 1388). Plaintiffs have not provided evidence that they were informed of the transition at the time. Nor do Plaintiffs suggest that PHH actually pursued a wrongful foreclosure after terminating either repayment plan. To the contrary, the parties agree that PHH offered Plaintiffs a fourth repayment plan, which remains in effect today. Regardless, the Court is not prepared to interpret Section 1322.40 so broadly as to mean that a mortgage servicer violates the statute any time the servicer merely threatens a potential foreclosure. PHH is entitled to summary judgment on this portion of Plaintiffs' Section 1322.40 claim as well.

### 2. Section 1322.45

Plaintiffs also assert a claim under Section 1322.45 of the RMLA. As noted above, that provision provides, in relevant part, that a registrant must "[a]ct with reasonable skill, care, and diligence" and must "[a]ct in good faith and with fair dealing" in connection with any transaction. O.R.C. § 1322.45(A)(3)-(4).

Plaintiffs base their Section 1322.45 claim on the same conduct underlying their Section 1322.40 claim, and the Court's analysis is largely the same as well. For the reasons discussed above, Plaintiffs have created a triable issue regarding whether PHH acted with reasonable skill, care, and diligence and acted in good faith and with fair dealing by terminating the repayment plans for non-payment of property taxes before Plaintiffs actually committed a default. *Cf. Steele*, 2024 WL 37116, at *4 (holding that plaintiff plausibly alleged

that mortgage servicer violated Section 1322.45(A)(3)-(4) by failing to provide plaintiff with loan modification documents after modification was allegedly approved); *Guzman*, 2024 WL 1973096, at *17 (holding that plaintiff plausibly alleged violation of Section 1322.45 by failing to provide written confirmation that loan was in forbearance despite promising that it would do so).

However, as with their Section 1322.40 claim, Plaintiffs fail to create a triable issue that PHH violated Section 1322.45 in connection with the Third Foreclosure Action or by threatening foreclosure after terminating the repayment plans. Plaintiffs have not shown that PHH acted without reasonable skill, care, or diligence by taking less than a month to dismiss the foreclosure action and by dismissing the action on the wrong grounds, nor have Plaintiffs shown that PHH's actions violated its duty to act in good faith and with fair dealing. Plaintiffs also have not provided any authority that a mortgage servicer acts without reasonable skill, care or diligence—or fails to act in good faith—merely by threatening foreclosure on a defaulted loan. PHH's motion for summary judgment is therefore granted on these portions of Plaintiffs' Section 1322.45 claim as well.

### 3.    *Damages*

Finally, PHH argues that Plaintiffs have not provided evidence that they suffered recoverable damages on their RMLA claim under either Section 1322.40 or Section 1322.45. Damages are an element of an RMLA claim, so if PHH is correct that Plaintiffs have not established them, PHH is entitled to summary judgment. *See* O.R.C. § 1322.52(A)(1) (providing that an "injured" buyer may bring a claim for damages); *Guzman*, 2024 WL 1973096, at *16 ("To succeed on a RMLA claim, a plaintiff must show a resulting injury.")

Section 1322.52(A)(2) provides that damages for violations of Section 1322.40 "shall not be less than all compensation paid directly and indirectly to a registrant or mortgage loan

originator from any source, plus reasonable attorney's fees and costs." O.R.C. § 1322.51(A)(2). Section 1322.45(D)(2) likewise provides that damages for a violation of Section 1322.45 "shall not be less than all compensation paid directly or indirectly to a mortgage broker from any source, plus reasonable attorney's fees and costs." O.R.C. § 1322.45(D)(2).

PHH argues that both provisions limit the categories of recoverable damages, providing that a plaintiff may recover *only* the compensation the paid to directly or indirectly to the registrant, mortgage loan originator, or broker. Plaintiff, by contrast, argues that both provisions set a floor on recoverable damages—providing that damages shall not be less than the amount paid—but that they do not prohibit plaintiffs from recovering other damages proximately caused by a defendant's violation of the RMLA. Neither party cites any cases analyzing the proper scope of Section 1322.51(A)(2) or Section 1322.45(D)(2), and the Court's own research has not uncovered any relevant authorities.

As noted above, the Court must predict how the Ohio Supreme Court would rule on the issue. *See Miller Brewing Co.*, 690 F.3d at 792; *Yost*, 929 F.3d at 374. After careful consideration, the Court concludes that Plaintiffs have the better of the argument and that the Ohio Supreme Court would likely hold that Sections 1322.51(A)(2) and 1322.45(D)(2) provide a floor for recoverable damages but do not limit plaintiffs to those specific categories. If the Ohio Legislature had wanted to confine RMLA plaintiffs to *only* the amounts paid to registrants, brokers, or originators, the Legislature could have written the statute to say so. Instead, both provisions provide that damages shall "not be less than" the amounts paid. That language clearly contemplates that damages can be *greater* than the amounts paid, and nothing else in the statute appears to limit the categories of damages.

For the reasons discussed above in connection with Plaintiffs' breach of contract claim, Plaintiffs have created a triable issue regarding whether PHH's alleged breach of the Second and Third Repayment Plans caused them damages. PHH's motion for summary judgment is therefore denied with respect to Plaintiffs' RMLA claims to the extent Plaintiffs base those claims on PHH's termination of the repayment plans.[6]

## V.        CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART PHH's motion for summary judgment. PHH is granted summary judgment on Plaintiffs' RMLA claim to the extent Plaintiffs base their claim on; (1) PHH's alleged actions in connection with the Third Foreclosure Action; and (2) PHH's alleged foreclosure threats following termination of the Second and Third Repayment Plans. PHH's motion for summary judgment is otherwise denied.

**IT IS SO ORDERED.**

Dated: August 25, 2025                           /s Jennifer Dowdell Armstrong
                                                 Jennifer Dowdell Armstrong
                                                 U.S. Magistrate Judge

---

[6] To the extent PHH wishes to argue that damages for emotional distress, or any other particular category of damages, are not available under the RMLA, PHH may file a motion *in limine* seeking to exclude evidence regarding those damages.